RUSSELL, J., for the Court:
¶ 1. Dorothy Knight filed an application for disability benefits with the Public Employees’ Retirement System (PERS). Knight’s application was denied by the PERS Medical Board, and she appealed to the PERS Disability Appeals Committee (Committee). The Committee recommended to the PERS Board of Trustees (Board) that the benefits be denied. The Board agreed with the recommendation and denied disability benefits to Knight. Knight appealed to the Circuit Court of the First Judicial District of Hinds County, which affirmed the decision of the Board. Knight appeals that decision, arguing it was not supported by substantial evidence. Upon review, we find no error. Therefore, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Knight was employed as a committee assistant for the Mississippi State Senate for over twenty-five years. As a committee assistant, Knight was required to be on her feet, run up and down stairs, stand at the copy machine, prepare for committee meetings, and perform other administrative and clerical tasks. During session, Knight was required to work a minimum of nine to fourteen hours per day. According to Knight’s supervisors and colleagues, she rarely missed a day of work and was a hard-working, devoted employee.
¶ 3. On April 28, 2006, Knight filed an application for retirement benefits with PERS seeking non-duty related disability benefits. Knight resigned a few months later. On her medical-information form, Knight stated that her disability consisted of the following:
Severe pain in feet; numbness in feet causing me to feel off balance. Have had pain for 17 years; has become more severe last 2 years. My feet are numb all the time now; however, I can still feel the pain coming from inside my feet. Also, both feet are red and look as though they have fever. They also stay swollen most of the time. I have broken capillaries on top of both feet. Every step I take is painful.
¶ 4. Several hearings were held before the Committee. Knight confirmed she had problems with her feet for the past seventeen or eighteen years, and she resigned her position with the Mississippi Senate because these problems became more se *943 vere in the last two or three years. Specifically, Knight testified: she had pain inside her feet; her feet would turn red and feel hot as though they had a fever; she had a “stabbing” or “throbbing” or “burning” sensation at times; and every step was “totally agonizing.” Knight felt as though someone was trying to push a fist through the bottom of her foot. She also complained of numbness in her feet all the way up through her knees. According to Knight, she felt as though she was wearing a pair of body socks half way up her legs. Knight stated she had pain in her feet all the time, but she would experience excruciating pain every once in a while. Knight testified that the only problems preventing her from working were her feet and, toward the end of her time at the Senate, her restless-leg syndrome (RLS).
¶ 5. Knight testified she never asked her employer for accommodations such as a scooter, rolling wheelchair, or walking device because such accommodations were not really possible as a committee assistant. According to Knight, such devices would be an obstacle because she was required to jump up and go on a regular basis. Knight testified she tried different types of shoes to help relieve her pain, along with shoe inserts, but neither helped alleviate her problems. She stated she never tried orthopedic shoes, and she never wore tennis shoes at work. Instead, she only wore flats. Knight noted that at the time of the hearing, she wore nothing but Keds tennis shoes. Knight stated she avoided going out to lunch to avoid being on her feet. Knight confirmed she did not apply for benefits from the Social Security Administration.
¶ 6. According to Knight, Dr. Yawn, now deceased, diagnosed Knight with peripheral neuropathy back in 1988 or 1989. Knight’s sister, Bettie Knight (“Bettie”), stated she personally attempted to obtain these records, but she was unable to do so. Knight herself testified that Dr. Yawn’s records had been transferred to Dr. Ann Meyers, but Dr. Meyers destroyed the records after holding them for a seven-year period.
¶ 7. Dr. Richard Weddle, a neurologist, performed a nerve-conduction study, which turned out to be normal. Dr. Weddle informed Knight she did not have peripheral neuropathy. Dr. Weddle also told Knight he did not know what was causing her foot pain. Instead, he diagnosed Knight with vascular headaches, RLS, and some edema of her feet with some discolored skin probably due to venous insufficiency.
¶ 8. Knight was evaluated by Dr. Alan R. Moore, who also conducted a nerve-conduction study, which was normal. He further stated there was no evidence of neuropathy contributing to feet pain, and the examination was more consistent with an orthopedic process.
¶ 9. In accordance with the Committee’s request, Knight was evaluated by Dr. Samuel H. Peeples, an internist, who conducted an independent medical examination. Dr. Peeples’s report in pertinent part states:
The patient’s symptoms are very suggestive of peripheral neuropathy. The symptoms[,] as she describes them to me[,] are severe enough that it would suggest the possibility of disability. The difficulty is that her nerve conduction studies were normal just two years ago. Also[,] the fact that Dr. Weddle, her neurologist, has not stated on forms or in his progress notes that there symptoms are severe enough for disability. It is possible that she may need repeat nerve conduction studies since she says that her symptoms have worsened, and we may need to obtain Dr. Weddle’s *944 opinion about this. At this point, I cannot state that she is disabled, although she seems to be a truthful patient. It does appear that her symptoms are aggravated a great deal by her work.
¶ 10. The Committee also referred Knight to Dr. Phillip Blount, an orthopedic surgeon. Dr. Blount reviewed three elec-trodiagnostic evaluations, all of which failed to demonstrate peripheral neuropa-thy. He opined that Knight’s complaints were not related to her work as a committee assistant. Dr. Blount stated that he would defer to Dr. Weddle, the neurologist, for peripheral neuropathy judgment. He did acknowledge that “[i]t is well known in the medical literature that un-myelinated type C pain fibers can cause painful neuropathy!,] and these are not detected on routine electrodiagnostic evaluations”; therefore, he found it was possible that she did have a peripheral neuro-pathy which was not detected on nerve-conduction studies or needle EMG. He noted that Knight had some arthritic changes in her feet. Dr. Blount indicated Knight had reached maximum medical improvement, and he gave her a seventeen percent whole-person impairment rating based on gait and mobility. He recommended referral to an orthotist for shoe modifications to include a metatarsal bar to offload her metatarsal head and to provide cushioning to the soles of her feet. Finally, Dr. Blount opined Knight was suitable for sedentary work, but she should not be asked to walk long distances.
¶ 11. Dr. B.T. Sullivan, a podiatrist, informed Knight that she had a broken bone on the top of her right foot, several broken toes, and a bunion on each foot. He eventually performed surgery to correct most of these problems. According to Knight, Dr. Sullivan opined the numbness in her feet and her other foot pain had nothing to do with the broken bones or bunions.
¶ 12. The Mississippi Senate Comptroller testified Knight could not perform her job because the rigors of working for the Legislature during session required a minimum of nine to fourteen hours per day, and the job demanded that she constantly be on her feet. She further stated Knight could no longer perform her job without enduring debilitating pain, but if this pain was corrected, she could continue to work. Finally, she stated that all positions for which Knight would be qualified would require similar or increased job duties.
¶ 13. Three senators who personally worked with Knight testified on her behalf. Each testified they personally observed Knight’s health decline to the point she could no longer function. They observed Knight humped over, with her neck drawn to one side. This was the first time any neck issues were brought up before the Committee, as Knight had not previously complained of any problems with her neck. Knight then testified she did have some problems with her neck and slouching over, and she went to a chiropractor for an adjustment, which seemed to help. The senators also testified it was obvious to them how much pain Knight was in on a daily basis, and it was heartbreaking to watch her suffer. They also stated Knight would complain about the pain in her feet.
¶ 14. Janet Trotter, who worked with Knight, testified she observed Knight in great pain, particularly in the past two or three years. She stated people at work were always asking what was wrong with Knight. Trotter testified, despite Knight’s pain, she had one of the strongest work ethics she had ever seen.
¶ 15. Knight’s sister, Bettie, testified Knight had some falls due to her poor balance. She also stated Knight would wake up screaming and holding her feet in *945 the middle of the night when they lived together. Bettie testified she saw Knight’s head hit the bathroom floor and turn black and blue after a fall on one occasion. Knight’s friend, Ellis Morrison, testified he has seen Knight fall in the kitchen many times, and she fell in the doctor’s office just days prior to the hearing.
¶ 16. The Committee submitted its proposed statement of facts, conclusions of law, and recommendations to the Board of Trustees, which provided in part:
The employer’s certification of job description states that Ms. Knight does her job but with pain. Pain is subjective[,] and there is no way to measure it. There is no statutory provision wherein an award of disability can be granted for pain when no objective reason for that pain can be produced. We have no proof of a medical illness that is causing Ms. Knight’s pain. We have noted that she has some arthritis of the feet but that does not explain the complaints of sock like numbness and fever. We cannot recommend disability without persuasive and credible objective medical evidence of a disability. Thus, in this case, we cannot recommend Ms. Knight’s request for disability be approved.
¶ 17. The question before us is whether there is substantial evidence to support the PERS’s decision to deny Knight disability benefits. Finding no error, we affirm.
DISCUSSION
¶ 18. We begin by noting, “[t]his Court applies a limited standard of review to the decisions of administrative agencies.” Stevison v. Pub. Employees Ret. Sys., 966 So.2d 874, 878 (¶ 15) (Miss.Ct.App.2007) (citing Pub. Employees Ret. Sys. v. Ross, 829 So.2d 1238, 1240 (¶ 11) (Miss.2002)). We will reverse an agency’s decision only when it is “unsupported by substantial evidence, was arbitrary and capricious, was beyond the power of the agency to make, or violated some constitutional or statutory right of the complaining party.” Id. (citing Ross, 829 So.2d at 1240 (¶ 8)).
¶ 19. “ ‘Substantial evidence’ has been defined as “that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred.” Id. at 878-79 (¶ 16) (citing Pub. Employees Ret. Sys. v. Dishmon, 797 So.2d 888, 892 (¶ 13) (Miss.2001)). Further, “[t]o be substantial, the evidence must be something more than a mere scintilla or suspicion.” Id. at 879 (¶ 16) (citing Pub. Employees Ret. Sys. v. Marquez, 774 So.2d 421, 425 (¶ 13) (Miss.2000)). Our supreme court has defined substantial evidence as “relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Pub. Employees Ret. Sys. v. Cobb, 839 So.2d 605, 609 (¶ 14) (Miss.Ct.App.2003) (quoting Marquez, 774 So.2d at 425 (¶ 13)).
¶ 20. Additionally, “[i]f an agency’s decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious.” Stevison, 966 So.2d at 879 (¶ 16) (quoting Marquez, 774 So.2d at 430 (¶ 35)). A decision by an administrative agency is arbitrary “if not done .according to reason or judgment, but depending on the will alone.” Id. (quoting Miss. State Dep’t of Health v. Natchez, 743 So.2d 973, 977 (¶ 13) (Miss.1999)). “An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles.” Id.
¶21. The applicant for disability benefits has the burden of proving her right to compensation. Cobb, 839 So.2d at 609 (¶ 15) (citing Thompson v. Wells-La *946 mont Corp., 362 So.2d 688, 641 (Miss.1978)). If evidence was lacking at the agency level, this lack of evidence may become the substantial evidence on appellate review to support a disposition affirming the agency’s determination. Id. at 609-10 (¶ 16). Thus, the substantial-evidence requirement may be satisfied “by an appellate determination that the agency’s conclusion that the claimant’s evidence was so lacking or so unpersuasive that she failed to meet her burden[.]” Id. at 609 (¶ 16).
¶ 22. There is a rebuttable presumption “in favor of the action of an administrative agency, and the burden of proof is on the party challenging an agency’s action.” Marquez, 774 So.2d at 425 (¶ 11) (citing Brinston v. Pub. Employees Ret. Sys., 706 So.2d 258, 260 (¶ 6) (Miss.Ct.App.1998)). “In administrative matters, the agency, and not the reviewing court, sits as [the] finder of fact.” Cobb, 889 So.2d at 609 (¶ 12) (citing Metal Trims Indus., Inc. v. Stovall, 562 So.2d 1293, 1296 (Miss.1990)). “That fact-finding duty includes assessing the credibility of witnesses and determining the proper weight to give to a particular witness’s testimony.” Id. (citing Walker Mfg. Co. v. Butler, 740 So.2d 315, 325 (¶ 46) (Miss.Ct.App.1998)). This Court “is obligated to afford such determinations of credibility in the fact-finding process substantial deference when reviewing an administrative determination on appeal[,] and the court exceeds its authority when it proceeds to re-evaluate the evidence and makes its own determination of the trustworthiness of some particular testimony.” Id. (citing Smith v. Jackson Const. Co., 607 So.2d 1119, 1123-24 (Miss.1992)).
¶ 23. Our Legislature created a retirement system to provide retirement benefits and other benefits to state employees. Miss.Code Ann. § 25-11-101 (Rev.2010). Pursuant to Mississippi Code Annotated section 25-11-113(l)(a)-(b) (Supp.2011), disability benefits may be awarded as follows:
Upon the application of a member or his employer, any active member ... may be retired ... provided that the medical board, after an evaluation óf medical evidence that may or may not include an actual physical examination by the medical board, certifies that the member is mentally or physically incapacitated for the further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired; however, the board of trustees may accept a disability medical determination from the Social Security Administration in lieu of a certification from the medical board. For the purposes of disability determination, the medical board shall apply the following definition of disability: the inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation, or the incapacity to perform the duties of any employment covered by the Public Employees’ Retirement System ... that is actually offered and is within the same general territorial work area, without material reduction in compensation.
Any inactive member ... is not eligible for a disability retirement allowance unless the disability occurs within six (6) months of the termination of active service and unless satisfactory proof is presented to the board of trustees that the disability was the direct cause of withdrawal from state service.
¶ 24. Applying this statute, “[t]he question before the PERS Medical Board, the Disability Committee, and the Board of *947 Trustees was whether or not [the applicant’s] claim met the statutory requirements for receipt of permanent disability benefits.” Marquez, 774 So.2d at 425 (¶ 14). Thus, there are two requirements that must be satisfied before an applicant is determined disabled. Id. First, the medical board must evaluate the medical evidence and “certify that the applicant is ‘mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that the member should be retired.’ ” Id. “Second, the medical board must apply the statutory definition of ‘disability’ ” as set forth in the above-stated statute. Id. at 426 (¶ 14).
¶ 25. In Laughlin v. Public Employees Retirement System, 11 So.3d 154, 155 (¶¶ 3-4) (Miss.Ct.App.2009), a teacher applied for disability benefits claiming she was permanently disabled primarily due to pain. Following a hearing, disability benefits were denied, and the teacher appealed. Id. at 158 (¶ 16). The teacher argued that the testimonies of two of her former coworkers supported her claim for disability. Id. at (¶ 19). These colleagues testified: they observed the teacher in pain; they would cover her shifts at times; and the teacher often complained about her pain. Id. at 158-59 (¶ 19). The teacher further argued her doctor’s conclusion that her “disability [was] manifested] mainly by the level of pain” supported an award of disability benefits. Id. at 159 (¶ 20). Finally, the teacher argued “the Committee improperly dismissed her complaints of pain, concluding that it could not award her disability benefits because ‘pain, unfortunately[,] cannot be measured objectively.’ ” Id. This Court found the doctor was merely expressing an opinion regarding the level of pain, not an opinion that the teacher was disabled. Id. at 159 (¶ 21). We also distinguished Lynn Laughlin’s case from two other cases where disability benefits were awarded as follows:
[W]e think it is appropriate to mention two opinions rendered by this Court: Stevison v. [Pub. Employees Ret. Sys.], 966 So.2d 874, 875 (¶ 1) (Miss.Ct.App.2007) and [Pub. Employees Ret. Sys.] v. Waid, 823 So.2d 595, 598 (¶ 12) (Miss.Ct.App.2002). In each of these cases, on facts very similar to the facts in today’s case, we either reversed or approved the circuit court’s reversal of PERS’s decision denying disability benefits to the claimants. However, these cases are distinguishable from the case before us, as in each of them a physician stated emphatically that the claimant was disabled. See Stevison, 966 So.2d at 880 (¶ 19); Waid, 823 So.2d at 598 (¶ 10). Unlike the physicians in Stevison and Waid, all of the physicians in our case either offered no opinion regarding Laughlin’s disability or concluded that she was not disabled.
Laughlin, 11 So.3d at 159 (¶ 23). Therefore, this Court affirmed the judgment of the circuit court denying disability benefits. Id. at 162 (¶ 28).
¶26. Like the Laughlin case, each of Knight’s doctors either offered no opinion regarding Knight’s disability or determined Knight was not disabled. Not a single doctor concluded Knight was permanently incapacitated or incapable of returning to her employment as required under the statute. Although one doctor stated her symptoms were suggestive of peripheral neuropathy, which could suggest the possibility of disability, he ultimately concluded she was not disabled.
¶27. All of Knight’s nerve-conduction studies were normal. Knight admitted she never asked for accommodations at work, and she never sought shoe modifications. Instead, Knight wore flats and Keds tennis shoes. According to Knight and her colleagues, Knight did not miss work due to *948 pain. In sum, this is a case where evidence to support disability is simply lacking. See Cobb, 839 So.2d at 609-10 (¶ 16) (holding that “in something of a paradox, the lack of evidence at the agency level becomes the substantial evidence on appellate review that suggests the necessity of affirming the agency’s determination”).
¶28. We find there is substantial evidence to support the decision of the circuit court in affirming the decision of the Board to deny Knight disability benefits. Therefore, the judgment of the circuit court is affirmed.
If 29. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, P.J., AND CARLTON, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. MYERS, J., NOT PARTICIPATING.